IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SETI JOHNSON and MARIE            )
BONHOMME-DICKS, on behalf of      )
themselves and those similarly    )
situated, and SHAREE SMOOT and    )
NICHELLE YARBOROUGH, on behalf    )
of themselves and those           )
similarly situated,               )
                                  )
                Plaintiffs,       )
                                  )
        v.                        )        1:18-cv-467
                                  )
TORRE JESSUP, in his official     )
capacity as Commissioner of       )
the North Carolina Division of    )
Motor Vehicles,                   )
                                  )
                Defendant.        )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

        This civil action arises out of the revocation of Plaintiffs'

North Carolina driver's licenses, pursuant to N.C. Gen. Stat. § 20-

24.1(a)(2), because of Plaintiffs' failure to pay court fines and

costs for motor vehicle violations.  Plaintiffs seek declaratory

and injunctive relief against Defendant Torre Jessup, in his

official capacity as Commissioner of the North Carolina Division

of Motor Vehicles ("DMV"), for enforcing section 20-24.1(a)(2)

against them in alleged violation of their equal protection and

due process rights under the Fourteenth Amendment to the United

States Constitution.  Specifically, Plaintiffs — who have limited

financial means — claim that it is unconstitutional for the DMV to revoke their driver's licenses for failure to pay fines and costs without first affirmatively determining that they have the ability to pay.

Before the court are the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) (Doc. 46) and Plaintiffs' motions for class certification pursuant to Rule 23(b)(2) (Doc. 36) and preliminary injunction pursuant to Rule 65 (Doc. 38). For the reasons set forth below, the Commissioner's motion for judgment on the pleadings will be granted in part and denied in part, Plaintiffs' motion for class certification will be granted, and Plaintiffs' motion for preliminary injunction will be denied.

## I. BACKGROUND

Like many states, North Carolina has enacted statutes directing the revocation of driver's licenses for failure to pay fines and costs imposed for traffic violations. The statutory scheme works as follows: North Carolina courts "must report" to the DMV the name of a traffic defendant who "fail[s] to pay a fine, penalty, or costs within 40 days of the date specified in the court's judgment." N.C. Gen. Stat. § 20-24.2(a)(2). Upon receipt of this notice, the DMV "must revoke" the traffic defendant's driver's license indefinitely. Id. § 20-24.1(a). Revocation is accomplished through the DMV's issuance of a "[r]evocation

2

order[]" to the traffic defendant that becomes "effective on the sixtieth day after the order is mailed or personally delivered to the person." Id.

Unlike some states, North Carolina provides a procedure by which traffic defendants can avoid or undo license revocation by showing that their failure to pay is no fault of their own.[1] Section 20-24.1(b)(4) states that a traffic defendant may "demonstrate[] to the court that his failure to pay the penalty, fine, or costs was not willful and that he is making a good faith effort to pay or that the penalty, fine, or costs should be remitted." If the court determines that the traffic defendant has made a sufficient showing, the court notifies the DMV; upon receipt of this notice, the DMV is required to rescind any revocation order (if the order is pending but not yet in effect) or restore the traffic defendant's license (if the revocation order has already gone into effect). Id. § 20-24.1(b), (c). Moreover, section 20-24.1(b1) expressly provides an opportunity for traffic defendants to address their ability to pay: "A defendant must be afforded an opportunity for a trial or a hearing within a reasonable time of the defendant's appearance . . . [u]pon motion of [the] defendant." The revocation orders the DMV issues to traffic defendants cite to

---

[1] For discussion of other state statutory schemes, see, e.g., Mendoza v. Garrett, No. 3:18-cv-01634-HZ, 2018 WL 6528011, at *1–4 (D. Or. Dec. 12, 2018); Robinson v. Purkey, 326 F.R.D. 105, 115–23 (M.D. Tenn. 2018); Fowler v. Johnson, No. 17-11441, 2017 WL 6379676, at *1–2 (E.D. Mich. Dec. 14, 2017), appeal filed, No. 17-2504 (6th Cir. Dec. 19, 2017).

section 20-24.1 but do not mention any of its provisions or otherwise refer to the ability-to-pay exception. (Doc. 35 ¶ 32.)

Named Plaintiffs Nichelle Yarborough and Sharee Smoot are low-income North Carolinians whose licenses have been suspended by the DMV for failure to pay fines and costs. (Docs. 5, 41.) Named Plaintiffs Seti Johnson and Marie Bonhomme-Dicks are low-income North Carolinians who currently owe fines and costs for traffic violations, and who are in imminent danger of license revocation.[2] (Docs. 4, 40, 63.) The named Plaintiffs claim that they are unable to pay the fines and costs imposed on them and that neither the state court nor the DMV has inquired into their ability to pay.[3] (Doc. 35 at 1-6.)

The named Plaintiffs are not alone. In the three-year period prior to the initiation of this lawsuit, about 55,000 traffic defendants received a revocation order but made their payments prior to the revocation date. (Doc. 62.) About 68,000 traffic defendants failed to make their payments by the revocation date,

_____

[2] The DMV has agreed to stay revocation of Johnson's license pending resolution of Plaintiffs' motion for preliminary injunction. (Doc. 55 ¶ 17.)

[3] The exception to the former is Smoot, who apparently became able to pay her fines and costs at some point after this lawsuit was filed. Plaintiffs recognized at the hearing on the present motions that her individual claims have become moot. As to the latter, Plaintiffs' counsel explained at the hearing that the state court waived Bonhomme-Dicks' fine for inability to pay at her initial appearance. However, according to Bonhomme-Dicks, the judge told her that "the legislature . . . prevented him from" waiving costs and proceeded to impose costs in the amount of $388. (Doc. 40 ¶ 8.)

4

had their licenses revoked, but eventually made the payments sometime thereafter. (Id.) About 63,000 traffic defendants never made their payments, and their licenses remain revoked. (Id.)

On May 30, 2018, Johnson and Smoot initiated this lawsuit. (Doc. 1.) Plaintiffs claim that the DMV's enforcement of section 20-24.1 violates the Fourteenth Amendment in three ways: (1) by violating their equal protection and substantive due process right not to be penalized for non-payment without the State first determining that they were able to pay and willfully refused; (2) by violating their procedural due process right to a hearing on ability to pay prior to revocation; and (3) by violating their procedural due process right to adequate notice. (Doc. 35 at 32–38.)

Plaintiffs contemporaneously moved for class certification (Doc. 3) and for preliminary injunction (Doc. 2), but later withdrew them in order to file an amended complaint (Doc. 35) on August 7, 2018, adding Yarborough and Bonhomme-Dicks as Plaintiffs. Plaintiffs then filed second motions for class certification (Doc. 36) and for preliminary injunction (Doc. 38). The Commissioner answered the amended complaint (Doc. 43) and moved for judgment on the pleadings (Doc. 46). On March 13, 2019, the court held a hearing on all outstanding motions, which are ready for decision.

## II.  ANALYSIS

### A.  The Commissioner's Motion for Judgment on the Pleadings

The legal standard governing motions for judgment on the pleadings is the same as that employed on motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014).  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable," demonstrating "more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556-57).

### 1.  Subject Matter Jurisdiction

The Commissioner first argues that the court lacks subject matter jurisdiction over Plaintiffs' claims under the Rooker-Feldman doctrine.[4]  Plaintiffs contend that the Commissioner reads

---

[4] Defendants normally raise subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss.  However, "[o]bjections to subject-matter jurisdiction . . . may be raised at any time."  Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011); see also Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  "[I]f a party raises an issue of subject matter jurisdiction on his motion for judgment on the pleadings, the court will treat the motion as if it had been brought under Rule 12(b)(1)."  Kelly v. United States, No. 7:10-CV-172-

the doctrine too broadly and that it does not apply in this instance.

The Rooker-Feldman doctrine — so named because of the Supreme Court's foundational decisions in Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983) — states that federal district courts may not sit in review of state court decisions.  Although the doctrine was construed expansively in the decades following Rooker, the Supreme Court has since clarified the "narrow" circumstances in which it is applicable: "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).  Where a plaintiff "is not challenging the state-court decision, the Rooker-Feldman doctrine does not apply." Davani v. Va. Dep't of Transp., 434 F.3d 712, 718 (4th Cir. 2006).

In the instant case, Plaintiffs do not challenge any judgment of a North Carolina court.  The Commissioner's argument to the contrary is based on a misunderstanding of the statutory scheme at issue, as evidenced by his repeated assertion that Plaintiffs are

---

FL, 2013 WL 5348455, at *3 (E.D.N.C. Sept. 23, 2013) (alteration in original) (quoting Newbrough v. Piedmont Reg'l Jail Auth., No. 3:10CV867-HEH, 2012 WL 169988, at *2 (E.D. Va. Jan. 19, 2012)).

"asking this Court to prohibit DMV from complying with license revocation orders issued by North Carolina courts." (Doc. 47 at 11.) It is simply untrue that North Carolina courts issue "license revocation orders" under the statutory scheme at issue here. Instead, state courts "report to the [DMV] the name of any person charged with a motor vehicle offense" who fails to pay a traffic violation fine or cost. N.C. Gen. Stat. § 20-24.2(a) (emphasis added). Upon receiving that "notice from [the] court," it is the DMV that issues a "[r]evocation order[]," which it then "mail[s] or personally deliver[s] to the person." Id. § 20-24.1(a) (emphasis added).

The only state court judgment relevant to this process is the underlying imposition of a traffic violation fine or cost, and Plaintiffs expressly do not challenge that judgment. (Doc. 51 at 12.) Plaintiffs' claims do not in any way implicate the soundness of the underlying traffic conviction and pecuniary imposition. A finding by this court that the DMV cannot constitutionally revoke Plaintiffs' driver's licenses for failure to pay a court-ordered fine or cost without first determining their ability to pay would not imply that the state court should not have imposed the fine or cost in the first place. See Stinnie v. Holcomb, 355 F. Supp. 3d 514, 524 (W.D. Va. 2018) ("Plaintiffs do not contest their convictions or the fines and costs assessed by the state court. Therefore, the outcome of this case will not affect those

judgments." (citation omitted)).[5]  Because a ruling for Plaintiffs would not involve this court's "review and rejection" of any state court judgment, Exxon, 544 U.S. at 284, the Rooker-Feldman doctrine does not bar Plaintiffs' claims.  See Stinnie, 355 F. Supp. 3d at 523–24; Fowler v. Johnson, No. 17-11441, 2017 WL 6379676, at *3 (E.D. Mich. Dec. 14, 2017) ("Plaintiffs are not . . . challenging the imposition of any fines, costs, or assessments . . . . Instead, Plaintiffs are challenging Defendant's revocation of their driver's licenses for failing to pay their traffic debt without consideration of their willfulness or ability to pay.

The Rooker-Feldman doctrine does not extend to Plaintiffs' claims."), appeal filed, No. 17-2504 (6th Cir. Dec. 19, 2017).

---

[5] The Stinnie court had previously dismissed the plaintiffs' original complaint under the Rooker-Feldman doctrine after finding that the Virginia statute at issue directed "license suspension orders [to be] issued by the state court." Stinnie v. Holcomb, No. 3:16-cv-00044, 2017 WL 963234, at *12 (W.D. Va. Mar. 13, 2017); see Stinnie v. Holcomb, 734 F. App'x 858, 861 n.* (4th Cir. 2018).  Even if the Stinnie court had not found Rooker-Feldman inapplicable in its later ruling on an amended complaint, see 355 F. Supp. 3d at 523–24, its former reasoning would be inapposite to the North Carolina statute at issue here, under which state courts do not issue revocation orders. See N.C. Gen. Stat. §§ 20-24.1, 20-24.2.  Furthermore, the Commissioner's representation that the Fourth Circuit "affirm[ed] dismissal of [the Stinnie] Complaint on the grounds that Plaintiffs' claims were barred by the Rooker-Feldman doctrine" (Doc. 47 at 9) evinces a fundamental misunderstanding of the Fourth Circuit's ruling.  The Fourth Circuit dismissed the appeal for lack of a "final, appealable order," expressly cautioning that its "discussion should not be read to indicate that [it] would hold that the district court's analysis was free from error were [it] to consider the appeal on the merits."  734 F. App'x at 862-63 (internal quotation marks and brackets omitted).  Only Chief Judge Gregory reached the Rooker-Feldman issue, noting in dissent that Rooker-Feldman "is an exceedingly narrow doctrine that has no relevance to the facts of this case." Id. at 868 (Gregory, J., dissenting).

Consequently, the Commissioner's reliance on Rooker-Feldman to avoid this litigation is misplaced.

### 2. Sovereign Immunity

The Commissioner next makes perfunctory arguments that Plaintiffs' claims are barred by the Eleventh Amendment: first, that Plaintiffs' claims impermissibly require the court to review past state acts that do not amount to ongoing constitutional violations, and second that the Commissioner himself is not sufficiently connected with the allegedly unconstitutional acts to be a proper defendant under Ex Parte Young, 209 U.S. 123 (1908). Both contentions are unpersuasive.

The Eleventh Amendment generally "confirms the sovereign status of the States by shielding them from suits by individuals absent their consent." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004). However, the Eleventh Amendment excepts from its bar "suits for prospective injunctive relief against state officials acting in violation of a federal law." Id. (citing Ex Parte Young, 209 U.S. 123). This exception has two components: whether "(1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." Republic of Paraguay v. Allen, 134 F.3d 622, 627 (4th Cir. 1998). As to the first, a plaintiff must merely show that he is "presently experienc[ing the] harmful consequences of [the State's] past conduct" in order to properly claim an "ongoing violation[] of

federally protected constitutional rights" sufficient to satisfy
Ex Parte Young. Id. at 628; see also Coakley v. Welch, 877 F.2d
304, 306-07 & n.2 (4th Cir. 1989) (finding that a plaintiff's claim
that he had been unconstitutionally fired alleged an "ongoing
violation" because his wrongful termination "continues to harm him
by preventing him from obtaining the benefits of [state]
employment"). Furthermore, the answer to the second inquiry tends
to drive the answer to the first, as "the issue of whether a
violation is 'ongoing' [is] related to the issues of whether
prospective relief is appropriate, or whether the requested relief
would operate instead as an illegitimate award of retroactive
damages." Coakley, 877 F.2d at 307 n.2. Ex Parte Young separately
requires an officer to have "some connection with the enforcement
of the [allegedly unconstitutional] act," 209 U.S. at 157, before
he may be sued; the officer must have some "proximity to and
responsibility for the challenged state action," as opposed to
mere "general authority to enforce the laws of the state." S.C.
Wildlife Fed'n v. Limehouse, 549 F.3d 324, 333 (4th Cir. 2008)
(emphasis and brackets omitted) (quoting Waste Mgmt. Holdings,
Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001)).

Plaintiffs easily satisfy these requirements. Although the
DMV's revocation of some Plaintiffs' driver's licenses took place
in the past, those Plaintiffs continue to experience the harmful
consequences of that action so long as their licenses remain

revoked. Thus, although the DMV is "no longer giving [those Plaintiffs] daily attention," its allegedly unconstitutional license revocations "continue[] to harm" those Plaintiffs by "preventing [them] from obtaining the benefits" they would otherwise enjoy as license-holders. Coakley, 877 F.2d at 807 n.2; see also id. ("Cases from other circuits, as well as [the Fourth Circuit], suggest that few, if any, suits are barred for failure to allege an 'ongoing violation' . . . .").[6] And the Commissioner's argument that he is not sufficiently connected to the enforcement of section 20-24.1(a)(2) to be a proper defendant under Ex Parte Young is based on the same mistaken argument addressed in the court's Rooker-Feldman analysis above: that "[t]he DMV simply complies with revocation orders issued by state courts." (Doc. 47 at 13-14.) As previously explained, North Carolina courts do not issue driver's license revocation orders for failure to pay traffic

---

[6] In some senses, the ongoing violation inquiry is merely another way of getting to the prospective relief inquiry. See Coakley, 877 F.2d at 307 n.2. Relief that is truly prospective does not compensate a plaintiff for past harm — it only prevents further harm. Thus, a finding that a plaintiff has requested truly prospective relief from state-caused harm in the present carries with it the connotation that the violation alleged must be "ongoing" in the sense relevant to Ex Parte Young. See Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002) (finding that a plaintiff's "prayer for injunctive relief . . . clearly satisfies [the] straightforward inquiry" of "whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" (internal quotation marks and brackets omitted)). In the instant case, there is no serious argument that Plaintiffs' requested relief is not prospective.

violation fines and costs;[7] the DMV, which the Commissioner heads, issues those revocation orders. See N.C. Gen. Stat. § 20-24.1(a); Torre Jessup: DMV Commissioner, North Carolina Department of Transportation (Feb. 5, 2019), https://www.ncdot.gov/about-us/our-people/leadership/Pages/torre-jessup.aspx (noting that, "[a]s commissioner, Torre Jessup oversees the daily operations of the N.C. Division of Motor Vehicles, including . . . driver licenses"). As a result, the Eleventh Amendment presents no bar to Plaintiffs' claims.[8]

### 3. Equal Protection and Substantive Due Process

Turning to the merits, the Commissioner moves for judgment on the pleadings on Plaintiffs' claim that revocation of their driver's licenses for failure to pay fines and costs without first affirmatively determining their ability to pay violates their equal protection and substantive due process rights under the "fundamental fairness" doctrine enunciated in cases like Bearden v. Georgia, 461 U.S. 660 (1983). The Commissioner argues that the

---

[7] The Commissioner has not persuasively explained why he would not have a sufficient connection to the enforcement of section 20-24.1(a)(2) even if he was merely enforcing revocation orders entered by state courts. However, the court need not consider that counterfactual scenario.

[8] The Commissioner also argues that the complaint should be dismissed because Plaintiffs' requested relief would not redress their injury, given the Commissioner's alleged helplessness "to intervene" when "a state court has entered a presumptively valid revocation order." (Doc. 47 at 15.) As previously explained, the statutory scheme at issue in this case directs the DMV, not state courts, to order license revocation. See N.C. Gen. Stat. §§ 20-24.1, 20-24.2. The Commissioner's argument therefore fails.

fundamental fairness doctrine does not apply to the statutory scheme at issue in this case, which should be upheld instead under the default rational basis standard.

It has long been black-letter law that, absent the involvement of a suspect classification or fundamental right, statutes challenged under the Fourteenth Amendment's equal protection or substantive due process guarantees are upheld so long as they have a "rational basis." See U.S. v. Caroline Prods. Co., 304 U.S. 144, 152 & n.4 (1938); Colon Health Ctrs. Of Am., LLC v. Hazel, 733 F.3d 535, 547-48 (4th Cir. 2013). The bar for surviving rational basis scrutiny is modest; as long as there is "any reasonably conceivable state of facts that could provide a rational basis" for the enactment, the statute must be upheld. F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993).

Nevertheless, beginning with a plurality opinion in Griffin v. Illinois, 351 U.S. 12 (1956) and running through (and beyond) a more definitive treatment in Bearden, the Supreme Court has held that "[d]ue process and equal protection principles converge" in some contexts into a constitutional requirement of "fundamental fairness" that calls for courts to make a more "careful inquiry into such factors as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, and the existence of alternative means for effectuating the purpose."

<u>Bearden</u>, 461 U.S. at 665–66, 673 (internal quotation marks and brackets omitted). In <u>Bearden</u> itself, the Court applied this inquiry to the question of whether state courts could revoke probation and incarcerate an individual for failing to pay a fine or restitution when the individual made bona fide efforts to pay but could not, ultimately holding that incarceration is "fundamentally unfair" in that context unless the state court determines there are no "alternate measures of punishment other than imprisonment . . . adequate to meet the State's interests." <u>Id.</u> at 672. The only contexts in which the Supreme Court has applied this fundamental fairness doctrine are those in which a state has deprived persons of fundamental rights because of their indigency — specifically, incarcerating them or denying them access to the courts when they cannot make a certain payment. <u>See, e.g.</u>, <u>Griffin</u>, 351 U.S. 12 (access to courts); <u>Williams v. Illinois</u>, 399 U.S. 235 (1970) (incarceration); <u>Tate v. Short</u>, 401 U.S. 395 (1971) (incarceration); <u>Bearden</u>, 461 U.S. 660 (incarceration); <u>M.L.B. v. S.L.J.</u>, 519 U.S. 102 (1996) (access to courts); <u>see also</u> <u>Tennessee v. Lane</u>, 541 U.S. 509, 522–23 (2004) (referring to "the right of access to the courts" as one of the "basic constitutional guarantees, infringements of which are subject to more searching judicial review").[9]

---

[9] To the extent the Court in some of these access-to-courts cases also considered the nature of the plaintiffs' underlying interest in the

Plaintiffs claim that the fundamental fairness doctrine applies to the statutory scheme at issue in this case, despite the fact that there is no fundamental right or interest at issue,[10] because Bearden in fact stands for the general principle that the Fourteenth Amendment "prohibit[s] the punishment of indigent people simply because of their poverty." (Doc. 51 at 20.) This construal of Bearden comes perilously close to an argument that courts must apply a higher standard of scrutiny to statutory classifications based on indigency — a principle the Supreme Court has "repeatedly" rejected in favor of rational basis analysis. Harris v. McRae, 448 U.S. 297, 323–24 (1980). More importantly, Plaintiffs have not proffered a single case from the Supreme Court or Fourth Circuit in the sixty-plus years since Griffin in which the fundamental fairness doctrine was applied to an alleged harm

---

substantive issue the plaintiffs wished to address in the courts, those interests were also "fundamental." See, e.g., Boddie v. Connecticut, 401 U.S. 371, 383 (1971) (right of access to courts is precondition of divorce, "the adjustment of a fundamental human relationship"); M.L.B., 519 U.S. at 121 (right of access to courts is necessary to allow participation in "parental status termination," which "is irretrievably destructive of the most fundamental family relationship" (internal quotation marks and brackets omitted)). Where the underlying substantive issue did not implicate a "fundamental" interest, the court eschewed a more searching inquiry in favor of the rational basis analysis. See M.L.B., 519 U.S. at 114–15 (discussing United States v. Kras, 409 U.S. 434 (1973), and Ortwein v. Schwab, 410 U.S. 656 (1973)).

[10] Although Plaintiffs stress that driver's licenses are "crucial" or even "essential," they do not argue that there is a fundamental right to a driver's license. (Doc. 51 at 4, 22); see also (Doc. 35 ¶ 121 ("Plaintiffs have a substantial interest in their driver's licenses.")). Courts in similar cases have treated and rejected such an argument. See Mendoza, 2018 WL 6528011, at *20; Fowler, 2017 WL 6379676, at *7–8.

not involving fundamental rights or interests.[11]  See Mendoza v. Garrett, No. 3:18-cv-01634-HZ, 2018 WL 6528011, at *19 (D. Or. Dec. 12, 2018) ("What all of these cases teach is that the 'fundamental fairness' principles of due process and equal protection originating in Griffin have been applied when either incarceration or access to the courts, or both, is at stake."); Fowler, 2017 WL 6379676, at *6-7 ("None of these cases establish . . . that it is fundamentally unfair in a constitutional sense . . . for a state to deprive a person of a property interest — such as a driver's license — because of the person's inability to pay a fine associated with that interest.").  Notably, Bearden itself encouraged courts to impose "alternate measures of punishment other than imprisonment" that would "meet the State's interests" in ways that did not result in incarceration.  461 U.S. at 672.  Driver's license revocation is just such an "alternate

---

[11] To the extent Plaintiffs may have suggested at the motions hearing that Alexander v. Johnson, 742 F.2d 117 (4th Cir. 1984), is such a case, on the idea that the Fourth Circuit applied Bearden to an "attorney fee recoupment" statute, the court disagrees.  The Alexander court did not expressly rely on Bearden for anything other than its holding that "an inmate violating any monetary requirement of his probation or restitution regiment cannot be imprisoned if his non-compliance results from poverty alone." Alexander, 742 F.3d at 124; see also id. at 125-26.  In their briefing, Plaintiffs' only citation for the proposition that the fundamental fairness doctrine applies to any "imposition of adverse consequences against indigent defendants solely because of their financial circumstances" is to a "Statement of Interest" filed by the United States in Stinnie.  (Doc. 51 at 21.)  However, that document does not cite any case applying the fundamental fairness doctrine in any context not involving incarceration or access to courts.

measure."[12]

In sum, contrary to Plaintiffs' contention, the fundamental
fairness doctrine does not apply to the indigency claim here, where
no fundamental right or interest is at stake. This leaves the
court to apply rational basis analysis, and section 20-24.1 easily
evinces the "constitutionally minimal level of rationality"
required. Van Der Linde Housing, Inc. v. Rivanna Solid Waste
Auth., 507 F.3d 290, 295 (4th Cir. 2007). Revocation of driver's
licenses for failure to pay traffic violation fines or costs
serves, in the Commissioner's words, to "impos[e] a motivation to
accomplish what an individual might otherwise be disinclined to
do" — here, to pay the fines and costs properly imposed on traffic
defendants.[13]  (Doc. 47 at 20.)  There is no argument that
collection of monetary exactions is not a legitimate state
interest.  Instead, Plaintiffs argue that the DMV sweeps too
broadly: that revoking the licenses of all traffic defendants who
don't pay their fines and costs irrationally results in the
revocation of the licenses of some who cannot pay, and to whom any

_____

[12] As discussed in more detail herein, North Carolina's statutory scheme
also includes an express procedure by which traffic defendants can avoid
or undo license revocation for failure to pay a fine or cost if they
show that their failure to pay was not "willful" and that they are making
a "good faith effort to pay."  N.C. Gen. Stat. 20-24.1(b)(4), (b1).

[13] To reiterate, Plaintiffs expressly do not argue that the fines and
costs were improperly imposed on them in the first place, only that the
DMV should not revoke their driver's licenses for failure to pay those
fines and costs without first determining that they are able to pay.

18

additional incentive to pay is ineffective.[14]  But the rational basis test does not require laws to be narrowly tailored to accomplish the State's ends.  See Van Der Linde, 507 F.3d at 295 ("The 'rational' aspect of rational basis review . . . is not an invitation to scrutinize . . . the instrumental rationality of the chosen means (i.e., whether the classification is the best one suited to accomplish the desired result).").  "Neither may a policy's rationality be judged on the basis of its wisdom, fairness, or logic (or lack thereof)." Id. at 293–94.  Since there is a "reasonably conceivable state of facts," Beach, 508 U.S. at 313, under which section 20-24.1(a)(2) provides some traffic defendants with an efficacious incentive to pay fines and costs, the law survives rational basis review.

Because the fundamental fairness doctrine does not apply and section 20-24.1 has a rational basis, Plaintiffs have not plausibly alleged an equal protection and substantive due process claim.  Accordingly, the court will grant the Commissioner judgment on the pleadings as to that claim.  The Commissioner presented no merits argument for judgment on the pleadings as to Plaintiffs' procedural due process claims, however, and for that reason those claims

---

[14] Indeed, as Plaintiffs point out, revocation of a person's driver's license may in some cases do more harm than good to the State's cause, given that losing the ability to drive can negatively impact a person's ability to earn money with which to pay their fines and costs.

survive at this time.[15]

**B.  Plaintiffs' Motion for Class Certification and Appointment of Class Counsel**

Plaintiffs move to certify two classes under Federal Rule of Civil Procedure 23(a) and (b)(2): the "Revoked Class," composed of everyone whose driver's license has been revoked by the DMV for failure to pay a traffic violation fine or cost, and the "Future Revocation Class," composed of everyone whose driver's license will be so revoked in the future.  Plaintiffs also move for appointment of class counsel under Rule 23(g).  The Commissioner opposes certification, challenging whether several of the prerequisites to certification have been met.

To be certified, a putative class must first satisfy the four

---

[15] At the motions hearing, the Commissioner initially represented that he had moved for judgment on the pleadings on the merits as to Plaintiffs' procedural due process claims.  When pressed by the court to identify where such an argument was made, counsel eventually admitted that the Commissioner's brief "do[es] not use the word procedural due process." While one sentence in the Commissioner's "Statement of the Case" does allege generally that section 20-24.1's "procedural protections . . . afford the Plaintiffs sufficient due process" (Doc. 47 at 3), this solitary statement falls well short of the court's requirement that "[o]pening briefs filed with the Court shall contain . . . argument, which shall refer to all statues, rules, and authorities relied upon." Local Rule 7.2(a).  Plaintiffs' responsive brief reflects a reasonable understanding that such an argument was not made.  (Doc. 51 at 20 n.4.) Allowing the Commissioner to raise a merits argument for dismissal of Plaintiffs' procedural due process claims for the first time at the motions hearing would have "undermine[d] the purpose of orderly briefing and risk[ed] subjecting an opponent to an unfair disadvantage."  N.C. Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010); see Lucas v. Henrico Cty. Sch. Bd., 822 F. Supp. 2d 589, 600 n.10 (E.D. Va. 2011) (declining to address a basis for dismissal "because it first arose during oral argument, because [the other party] has not had a full and fair opportunity to respond, and because the Court lacks the benefit of full briefing on the subject").

requirements set out in Rule 23(a): "(1) numerosity of parties; (2) commonality of factual and legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of representation." Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 423 (4th Cir. 2003). Next, the putative class must show that it is one of the three types of classes described in Rule 23(b). Here, Plaintiffs assert that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Nevertheless, district courts retain "broad discretion" in deciding whether a class should be certified and how that class should be defined. Roman v. ESB, Inc., 550 F.2d 1343, 1348 (4th Cir. 1976). "Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013). Otherwise, "[a]n evaluation of the probable outcome on the merits is not properly part of the certification decision." Id. (quoting 2003 Advisory Committee Note on Rule 23(c)(1)).

The Commissioner does not contest the adequacy of representation or the putative class's Rule 23(b)(2) categorization, and the court independently finds that these

requirements are met.  The named Plaintiffs do not appear to have interests that conflict with those of the class and have each explained their commitment to the litigation.  <u>See</u> (Docs. 4, 5, 40, 41, 63).  While Plaintiff Smoot appears to have paid her traffic fines and costs, Plaintiff Yarborough has not and can adequately represent the proposed Revoked Class.  Plaintiffs' counsel are adequate under Rule 23(a)(4) for the same reasons they satisfy the Rule 23(g) standard, as discussed below.  Finally, Rule 23(b)(2) — which "was created to facilitate civil rights class actions," <u>Thorn v. Jefferson-Pilot Life Ins. Co.</u>, 445 F.3d 311, 330 n.24 (4th Cir. 2006) — is satisfied because Plaintiffs seek injunctive and declaratory relief and challenge the Commissioner's class-wide enforcement of section 20-24.1(a)(2).

The Commissioner contests numerosity, commonality, and typicality.  Each will be addressed in turn.

### 1.  Numerosity

"There is no mechanical test for determining whether" the number of potential plaintiffs in a given action is sufficient to meet Rule 23(a)(1)'s requirement that joinder would be "impracticable." <u>Kelley v. Norfolk & W. Ry. Co.</u>, 584 F.2d 34, 35 (4th Cir. 1978) (per curiam).  Instead, the numerosity determination "depends on the particular facts of each case."  7A Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 1762 (3d ed. 2018) (also noting that "no arbitrary rules regarding the

size of classes have been established by the courts"). The Fourth Circuit has previously certified classes of as few as eighteen plaintiffs. See Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967); see also Dameron v. Sinai Hosp. of Baltimore, Inc., 595 F. Supp. 1404, 1408 (D. Md. 1984) ("A class consisting of as few as 25 to 30 members raises the presumption that joinder would be impractical.").

In this case, the Commissioner's argument is not so much that any specific number advanced by Plaintiffs is insufficient, but that Plaintiffs' numerosity evidence is too speculative. This argument attacks Plaintiffs' reliance in their opening brief on a September 26, 2017 email from a DMV employee stating that "[t]he total number of Failure to Pay is 436,050" (Doc. 6-9), on the basis that the email "does not explain the time frame of these suspensions, or even if the [number] is referring to individuals" (Doc. 48 at 7). The Commissioner goes on to criticize Plaintiffs for omitting any evidence concerning how many of these failure-to-pay license revocations involve traffic defendants who "are low income individuals." (Id.)

The Commissioner's concerns, however, are allayed by his own evidence. On March 13, 2019, the Commissioner filed the affidavit of a North Carolina Department of Transportation employee stating that in the three years prior to the lawsuit's initiation, 62,788 traffic defendants failed to pay their traffic violation fines and

costs and have therefore had their driver's licenses revoked.[16] (Doc. 62.)  This evidence is confined to a relevant timeframe and clearly refers to individual traffic defendants.  The Commissioner's protest that Plaintiffs have not supported their "allegation that the proposed Revoked Class members are low income individuals" (Doc. 48 at 7) is an attack on a straw man; Plaintiffs have never made such an allegation.  Plaintiffs' proposed classes consist of "all individuals" whose driver's licenses have been or will be revoked under section 20-24.1(a)(2).  Even looking only to the Commissioner's evidence, then, Plaintiffs' proposed Revoked Class consists of at least 62,788 individuals.  As to the proposed Future Revocation Class, the court may reasonably infer from the size of the Revoked Class that it too is large.  <u>See</u> 1 William B. Rubenstein, <u>Newberg on Class Actions</u> § 3:13 (5th ed. 2018) (courts may use available evidence to "make commonsense assumptions regarding the number of putative class members").  This evidence is sufficient to show that Rule 23(a)(1)'s numerosity requirement is met.

### 2. Commonality

Rule 23(a)(2) "requires the plaintiff[s] to demonstrate that the class members have suffered the same injury" in the sense that

---

[16] Another 67,809 traffic defendants eventually paid their fines and costs at some point after their license had already been revoked; 55,336 traffic defendants received a revocation order but paid their fines and costs within the 60-day period before the revocation went into effect. (Doc. 62.)

"[t]heir claims . . . depend upon a common contention," the determination of which "will resolve an issue that is central to the validity of each one of the claims." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). "[T]his provision does not require that all the questions of law and fact raised by the dispute be common," just that any "dissimilarities between the claims [do not] impede a common resolution." Wright et al., supra, § 1763.

The Commissioner does not address the seven common questions of law and fact listed in Plaintiffs' opening brief;[17] instead, he argues that the proposed class members have not "suffered the same injury" as Plaintiffs:

> Plaintiffs' [sic] complain that without a driver's license, they are forced to choose between going to work, getting food for the family, attending medical appointments, driving their kids to school, or driving on a revoked license. While the Plaintiffs' Declarations may provide evidence of their injuries, they do not provide evidence that any number of other people are facing the same injuries.

(Doc. 48 at 17–18 (citation and emphasis omitted).) Once again, the Commissioner misunderstands Plaintiffs' claims. The core injury Plaintiffs assert is the allegedly unconstitutional deprivation of their driver's licenses under section 20-24.1, not the practical effects of this revocation on their personal lives.

---

[17] One or two of these questions are rendered irrelevant by the court's dismissal of Plaintiffs' equal protection and substantive due process claim. The rest remain relevant.

While Plaintiffs do provide a litany of additional allegations regarding the personal hardships attendant to license revocation in what may be an attempt to underscore the seriousness and sympathetic nature of their claims, these additional allegations are not the constitutional injury Plaintiffs assert. In the court's view, the DMV's enforcement of section 20-24.1 against the named Plaintiffs and proposed class members provides sufficient common questions of fact and law on which to sustain a constitutional class action.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006) (quoting Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 340 (4th Cir. 1998)). In order to determine whether a named plaintiff's "claims or defenses" are typical of those of the proposed class, the court will frequently have to undertake some investigation of "the merits of the plaintiff's underlying claim." Dukes, 564 U.S. at 351.

The Commissioner offers four reasons that the court should decline to find the named Plaintiffs' claims typical of the proposed classes.

First, as in the commonality context, the Commissioner argues that Plaintiffs have not shown that the proposed class members are similarly low-income. (Doc. 48 at 11.) As the court pointed out in that context, the constitutional violations Plaintiffs assert are not dependent on whether a given traffic defendant would be able to successfully show inability to pay at an ability-to-pay hearing. It is the alleged lack of notice and a hearing prior to revocation that forms the basis of Plaintiffs' procedural due process claims. See Coe v. Armour Fertilizer Works, 237 U.S. 413, 424 (1915) ("To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits.").

Second, the Commissioner argues that "the relief sought by Plaintiffs would require an individualized inquiry into [each] driver's eligibility for reinstatement" (Doc. 48 at 12), the idea being that the driver's licenses of some class members may be revoked on additional bases. Although objections about the contours of any potential relief are more relevant to the Rule 23(b)(2) analysis than to typicality, compare Fed. R. Civ. P. 23(b)(2) (parties must show that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole") with Fed. R. Civ. P. 23(a)(3) (parties must show that their "claims or defenses" are typical of the class),

the Commissioner's concern is illusory in any context. As Plaintiffs point out, if the court ultimately finds that the DMV's enforcement of section 20-24.1(a)(2) is and has been unconstitutional, the court can order the DMV to annul all revocations within the class that were entered pursuant to that provision. It would remain for the DMV, not the court, to investigate whether a given license should remain revoked on some other basis or whether the license should be reinstated pending provision of sufficient due process.

Third, the Commissioner argues that some proposed class members may have received the ability-to-pay hearing that the named Plaintiffs did not. (Doc. 48 at 13.) Although this factual distinction, if it exists, might have created problems for the typicality of an as-applied challenge, Plaintiffs clarify that they "bring a facial challenge to Sections 20-24.1 and 20-24.2." (Doc. 50 at 10.) To the extent that the Commissioner may have understood Plaintiffs' procedural due process claims to be as-applied, Plaintiffs' clarification assuages his typicality concern.

Fourth, and finally, the Commissioner argues that the claims of some proposed Revoked Class members will be subject to a statute of limitations defense that the claims of the named Plaintiffs do not typify. (Doc. 48 at 11.) The Commissioner argues — and Plaintiffs do not contest — that the relevant statute of

limitations is three years. See N.C. Gen. Stat. § 1-52(5); Love v. Alamance Cty. Bd. of Educ., 757 F.2d 1504, 1506 & n.2 (4th Cir. 1985) (three-year statute of limitations applicable to 42 U.S.C. § 1983 actions in North Carolina); Nat'l Advert. Co. v. City of Raleigh, 947 F.2d 1158, 1162 (4th Cir. 1991). Since Plaintiffs claim that the Constitution requires pre-deprivation notice and an ability-to-pay hearing before a driver's license may be revoked under section 20-24.1(a)(2), and since the DMV notifies traffic defendants of the day that the revocation order will go into effect, each Plaintiff's claim accrued at least by the day that the DMV's revocation order became effective. See Ocean Acres Ltd. P'ship v. Dare Cty. Bd. of Health, 707 F.2d 103, 107 (4th Cir. 1983) ("[Plaintiff's] due process claims accrued when plaintiff knew of or had reason to know of the alleged injury which is the basis of its action."). Thus, the Commissioner argues, proposed Revoked Class members whose driver's licenses were revoked more than three years prior to the filing of this action will be subject to a statute of limitations defense not applicable to any of the named Plaintiffs.

Plaintiffs respond by invoking the "continuing violation doctrine, which provides that the statute of limitations may be tolled by a continuing unlawful . . . practice." Hall v. City of Clarksburg, No. 1:14CV90, 2016 WL 5680218, at *4 (N.D. W. Va. Sept. 30, 2016). In Plaintiffs' view, the fact that their licenses

remain revoked indefinitely means that the statute of limitations is also tolled indefinitely.

While Plaintiffs' view is not without superficial support, see Va. Hosp. Ass'n v. Baliles, 868 F.2d 653, 663 (4th Cir. 1989) ("[T]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations."), the Fourth Circuit has clarified that "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation," Raleigh, 947 F.2d at 1166 (quoting Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981)). In the context of the enforcement of allegedly unconstitutional laws, the question is whether the particular enforcement challenged "is a single act," in which case "the statute begins to run at the time of the act," or whether the enforcement "does not occur at a single moment but in a series of separate acts," in which case "the limitations period begins anew with each violation." Id. at 1167 (quoting Perez v. Laredo Junior Coll., 706 F.2d 731, 733 (5th Cir. 1983)). In the instant case, the DMV's revocation of driver's licenses is a "single act" — the fact that licenses remain revoked thereafter does not evince "a series of separate acts" in which the DMV revokes the driver's licenses anew each day.[18] See id. ("The

---

[18] Plaintiffs argue that the DMV's website, which reminds traffic defendants that their driver's licenses will remain revoked "indefinitely until [they] have complied with [their] case," shows that the Commissioner "is continuing to enforce th[e] illegal statute" against them. (Doc. 50 at 8 & n.3.) A notice of this type is "not a new wrongful

restriction on use . . . occurred upon enactment of the ordinance. No City action since then has added to [the plaintiff's] alleged injury."). As a result, it does not appear that the continuing violation doctrine would save the claims of proposed Revoked Class members whose licenses were revoked more than three years prior to filing.[19] This is a problem for typicality. See Kirkman v. N.C. R.R. Co., 220 F.R.D. 49, 53 (M.D.N.C. 2004).

Nevertheless, as Plaintiffs indicate, there is little reason why a solitary typicality issue applicable to an easily-identifiable and excludable group of proposed class members should preclude certification altogether. Instead, the court will simply exercise its discretion to define the proposed Revoked Class to include only those proposed class members within the three-year limitations period: those drivers whose licenses were revoked on

---

act, but merely a reminder of the restriction" imposed at the time of the original alleged violation. Raleigh, 947 F.2d at 1167. Since the DMV's website is not "add[ing] to [Plaintiffs'] alleged injury," each time they view it, it does not evince continuing "separate acts" sufficient to invoke the continuing violation doctrine. Id.

[19] At first glance, the court's conclusion that there is no "continuing violation" in the statute of limitations context may appear in tension with its earlier conclusion that there is an "ongoing violation" for purposes of the Ex Parte Young analysis. See Part II.A.2, supra. But the similarity of these shorthand terms belies a fundamental difference in the underlying doctrines: the "continuing violation" exception to statutes of limitations "is occasioned by continual unlawful acts, not continual ill effects from an original violation," Raleigh, 947 F.2d at 1166, whereas the "ongoing violation" requirement of Ex Parte Young is satisfied by "presently experienced harmful consequences of past conduct." Allen, 134 F.3d at 628.

or after May 30, 2015.[20]  See Roman, 550 F.2d at 1348 (noting the district court's broad discretion in how to define a class).

### 4.    Certification

Having resolved the Commissioner's objections, and upon its own investigation of the requirements of Rule 23(a) and (b)(2), the court finds that class certification is warranted.  The court will therefore certify the following two classes:

> Revoked Class: All individuals whose driver's licenses were revoked by the DMV on or after May 30, 2015, due to their failure to pay fines, penalties, or court costs assessed by a court for a traffic offense, and whose driver's licenses remain so revoked.[21]

> Future Revocation Class: All individuals whose driver's licenses will be revoked in the future by the DMV due to their failure to pay fines, penalties, or court costs assessed by a court for a traffic offense.

As noted, the court's certification of these classes is without determination of the ultimate merits of Plaintiffs' remaining claims.

---

[20] The Commissioner suggests that the cut-off date should be three years prior to the filing of the amended complaint.  (Doc. 47 at 22.)  But since the amended complaint asserts claims arising out of the conduct set out in the original complaint, the amended complaint relates back to the original complaint.  Fed. R. Civ. P. 15(c)(1)(B).

[21] Although Plaintiffs' proposed class is not expressly limited to those individuals whose licenses remain revoked, Plaintiffs' admission at the hearing that Smoot's claims have been mooted by her successful payment of her traffic fines and fees evinces such an understanding.  Moreover, Plaintiffs have not explained how drivers whose licenses have been reinstated would be victims of any "ongoing violation" under Ex Parte Young.

### 5. Appointment of Class Counsel

Plaintiffs also move for appointment of class counsel under Rule 23(g), which requires that the court consider the following:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g)(1)(A). In sum, "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

Plaintiffs are represented by Samuel Brooke, Kristi Graunke, Danielle Davis, and Emily Early of the Southern Poverty Law Center ("SPLC"); Christopher Brook, Cristina Becker, and Sneha Shah of the North Carolina ACLU ("NC-ACLU"); Nusrat Choudhury and R. Orion Danjuma of the national ACLU ("ACLU"); and Jeffery Loperfido of the Southern Coalition for Social Justice ("SCSJ"). Plaintiffs have filed the declaration of Samuel Brooke, in which he summarizes the extensive civil rights and class action experience and accomplishments of these attorneys and their organizations.[22] (Doc. 6.) Defendants have not disputed Plaintiffs' characterization of their attorneys as experienced, knowledgeable,

---

[22] Brooke does not discuss Loperfido's qualifications, since he joined the case at a later date. (Doc. 42.) However, the court is familiar with the SCSJ from prior litigation, and Loperfido's appointment to the large team of proposed class counsel is not opposed.

and capable of investing sufficient resources into this case.

The court has reviewed the requirements of Rule 23(g) and concludes that Plaintiffs' proposed class counsel are well qualified to represent the two classes in this case. Accordingly, Plaintiffs' SPLC, NC-ACLU, ACLU, and SCSJ counsel will be appointed class counsel.

### C. Plaintiffs' Motion for Preliminary Injunction

Finally, Plaintiffs move for preliminary injunction pursuant to Federal Rule of Civil Procedure 65:[23]

> (1) to enjoin Section 20-24.1(a)(2) and (b)(3)-(4); (2) to bar the DMV from revoking licenses for non-payment under Section 20-24.1(a)(2); and (3) to lift current license revocations entered under Section 20-24.1(a)(2) and reinstate those licenses without charging a reinstatement fee if there are no other bases for the revocation — pending the ultimate determination of the merits of Plaintiffs' claims.

(Doc. 39 at 8.)  The Commissioner opposes the motion primarily on the ground that Plaintiffs are not likely to succeed on the merits.[24]

---

[23] At the motions hearing, Plaintiffs expressed a desire for "a simultaneous ruling on both the motion for preliminary injunction and the motion for class certification" such that the court's ruling on the motion for preliminary injunction would apply class-wide.

[24] The Commissioner uses the terms "temporary restraining order" and "preliminary injunction" interchangeably throughout his response brief, including an argument that Plaintiffs' "motion for a preliminary injunction should be denied" because "reinstatement of Plaintiff[s'] licenses would go well beyond the intended purpose of temporary restraining orders under [Federal Rule of Civil Procedure] 65(b)." (Doc. 45 at 9.)  Plaintiffs have not moved for a temporary restraining order, nor is Rule 65(b) relevant to their preliminary injunction motion.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). It is not enough for a plaintiff to satisfy some factors but not others; "each preliminary injunction factor [must] be satisfied as articulated." Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013) (internal quotation marks omitted); Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship, ___ F.3d ___, 2019 WL 1140648, at *5 (4th Cir. Mar. 13, 2019). As to the first factor, "plaintiffs need not show a certainty of success," but must "make a clear showing that they are likely to succeed at trial." Pashby, 709 F.3d at 321 (internal quotation marks omitted). Because the court has determined that Plaintiffs' equal protection and substantive due process claim should be dismissed pursuant to the Commissioner's motion for judgment on the pleadings, only Plaintiffs' claims asserting a violation of procedural due process are considered here.

## 1. Likelihood of Success on the Merits

### a. Opportunity to be Heard

Plaintiffs argue that due process requires the DMV to hold an ability-to-pay hearing in every case prior to revoking a traffic defendant's driver's license under section 20-24.1(a)(2). The

Commissioner argues that no such hearing is required.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976) (internal quotation marks omitted). An individual's property interest in his or her driver's license is protected by the Due Process Clause. See Bell v. Burson, 402 U.S. 535, 539 (1971) ("Once licenses are issued . . . [they] are not to be taken away without that procedural due process required by the Fourteenth Amendment.). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews, 424 U.S. at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). The question of what form of hearing is required — including the "question . . . of timing," Dixon v. Love, 431 U.S. 105, 112 (1977) — is addressed through consideration of the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.

In the instant case, the statute provides that traffic

defendants may "demonstrate[] to the court that [their] failure to pay the penalty, fine, or costs was not willful and that [they are] making a good faith effort to pay or that the penalty, fine, or costs should be remitted." N.C. Gen. Stat. § 20-24.1(b)(4). If a traffic defendant makes such a demonstration, the court notifies the DMV, which "shall . . . delete[]" any pending revocation order or "restore the person's license" if revocation has already become effective. Id. § 20-24.1(b), (c). The statute also lays out a procedure for making this determination: "Upon motion of a defendant, the court must order that a hearing or trial be heard within a reasonable time. Id. § 20-24.1(b1).

In Plaintiffs' view, this procedure is insufficient because it requires traffic defendants to move for hearing, rather than affirmatively mandating that a pre-revocation hearing actually be held in every case. In order to evaluate Plaintiffs' claims that section 20-24.1 fails to provide traffic defendants with due process, the court must determine what process is due.

As to the first Mathews factor — the private interest at stake — the Supreme Court has previously held that a "driver's interest . . . in continued possession and use of his license . . . is a substantial one." Mackey v. Montrym, 443 U.S. 1, 11 (1979). And the court has no reason to doubt Plaintiffs' contention that, for many North Carolinians, the loss of a driver's license negatively impacts individuals' ability to get to work, make doctor's

appointments, go grocery shopping, and more.

Nevertheless, "the Court has expressly held that the [private] interest [in a driver's license] is not so great as to require departure from the principle that an evidentiary hearing is not ordinarily required prior to adverse administrative action." Tomai-Minogue v. State Farm Mut. Auto. Ins. Co., 770 F.2d 1228, 1235 (4th Cir. 1985) (citing Dixon, 431 U.S. at 113). Moreover, the Supreme Court has stated that courts should consider "[t]he duration of any potentially wrongful deprivation of a property interest" insofar as it relates to the "timeliness of the postsuspension review available to a suspended driver," and that this consideration "is an important factor in assessing the impact of official action on the private interest involved." Mackey, 443 U.S. at 12 (emphasis added); see also Fusari v. Steinberg, 419 U.S. 379, 389 (1975). In the present case, the fact that section 20-24.1(b1) guarantees traffic defendants the opportunity to have a hearing "within a reasonable time" of moving for one lessens "the impact of official action" on Plaintiffs' interests.[25] Mackey, 443 U.S. at 12.

In sum, while the court certainly "do[es] not disparage the

_____

[25] As discussed in footnote 33, infra, Plaintiffs have not provided the court with any way to determine how long "a reasonable time" under section 20-24.1(b1) might be in this context. Since Plaintiffs bear the burden at the preliminary injunction stage of showing they are likely to succeed on the merits, the court will not count this uncertainty in their favor.

importance of a driver's license" to Plaintiffs, and indeed recognizes the hardships often attendant to the loss of a driver's license, these considerations do not serve to overcome binding precedent holding that the private interest in driver's licenses is insufficient to mandate a pre-revocation evidentiary hearing. Tomai-Minogue, 770 F.2d at 1235.

The second Mathews factor is "the risk of an erroneous deprivation of [Plaintiffs'] interest[s] through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335. In this case, the threshold inquiry is whether the revocation of a traffic defendant's driver's license for failure to pay a fine or cost the traffic defendant was unable to pay is in fact "an erroneous deprivation" under Mathews. Given that there is no equal protection or substantive due process right not to have one's driver's license revoked for failure to pay without an ability-to-pay determination, the DMV's revocations cannot be "erroneous" in that regard. See Mendoza, 2018 WL 6528011, at *25 (finding "little risk of erroneous deprivation" where plaintiffs argued that license revocation without an ability-to-pay determination violated their "fundamental . . . constitutional right to an indigency determination," given the court's conclusion that there is no such right under equal protection or substantive due process).

The more difficult question is whether the North Carolina legislature's decision to include a provision allowing traffic defendants to avoid or undo license revocation by showing that their "failure to pay . . . was not willful and that [they are] making a good faith effort to pay," N.C. Gen. Stat. § 20-24.1(b)(4), shows that the legislature did not intend license revocation to take place when traffic defendants could not pay, thus making such revocations "erroneous deprivations" under Mathews. Plaintiffs argue that the answer must be yes under Bell v. Burson, 402 U.S. 535 (1971), in which the Supreme Court found that Georgia could not deny pre-revocation "consideration of an element essential [under the statutory scheme] to the decision whether licenses . . . shall be suspended." Id. at 542. The statutory scheme at issue in Bell required uninsured drivers involved in traffic accidents to "post[] security to cover the amount of damages claimed by aggrieved parties in reports of the accident" or else face license suspension. Id. at 536. It also allowed drivers to avoid or undo license suspension if, "prior to" or "after suspension has been declared, [there is] a release from liability or an adjudication of non-liability" for the accident. Id. at 541. "Since the statutory scheme makes liability an important factor in the State's determination to deprive an individual of his license[]," wrote the Bell Court, "the State may not, consistently with due process, eliminate consideration of

that factor in its prior hearing."[26]  Id.; see also Conn. Dep't of Pub. Safety v. Doe, 538 U.S. 1, 8 (2003) ("Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme.").

The Commissioner responds that the better analogue on this factor is Dixon v. Love, 431 U.S. 105 (1977), in which the Supreme Court found that there was little risk of erroneous deprivation absent a pre-deprivation hearing where Illinois suspended driver's licenses for accumulation of too many "points" assigned for traffic violations.  Id. at 107-08, 113-14.  Crucial to the Dixon Court's treatment of this Mathews factor, however, was that the driver's only potential argument at his requested hearing would be a dubious plea for the Secretary of State to "depart from his own regulations" and "show leniency."[27]  Id. at 114.  There was no assertion in Dixon that Illinois had intended a "leniency" determination to be relevant at all to license revocation, much less made it "an important factor in the State's determination to deprive an individual of his license[]," Bell, 402 U.S. at 541.[28]

---

[26] Georgia already provided a hearing under the statutory scheme at issue in Bell, but it "exclude[d] consideration of the motorist's fault or liability for the accident" at that hearing.  402 U.S. at 536.

[27] As to the possibility of "clerical error," the Dixon Court found that "written objection" sufficed to "bring a matter of that kind to the Secretary's attention."  431 U.S. at 113.

[28] In a footnote, Dixon briefly discussed a slightly more analogous

As a result, Dixon's "erroneous deprivation" analysis does not preclude Bell's relevance to a case, like this one, where Plaintiffs do cite a clear statutory basis for the issue they wish to address at a hearing. Applying Bell, the court finds that ability to pay is "an important factor" in North Carolina's statutory scheme much as accident liability was in the Georgia statutory scheme at issue in Bell. In both cases, the statute allows drivers to utilize the exception to revocation both "prior to" or "after" revocation takes place. Bell, 402 U.S. at 541; see N.C. Gen. Stat. § 20-24.1(b), (c). In both cases, the "important" nature of the relevant exception is shown through the statutory mandate that "no suspension [be] worked" under its provisions if the exception is satisfied. Bell, 402 U.S. at 541; see N.C. Gen. Stat. § 20-24.1(b), (c). In sum, because section 20-24.1 makes inability to pay an express exception to revocation, the revocation of a driver's license under that statute despite inability to pay would constitute an "erroneous deprivation" under Mathews. Bell, 402 U.S. at 541;[29] see Doe, 538 U.S. at 8.

_____

"erroneous deprivation" argument: that revoking a driver's license when the driver qualified for a "restricted permit" under a statutory "hardship exception[]" would be an "erroneous deprivation." 431 U.S. at 114 n.10. However, the Court found that such a revocation would not be erroneous because the Illinois statute manifestly "contemplate[d] relief only after the initial decision to suspend or revoke is made." Id. (emphasis added). This reasoning does not apply in the instant case because the statute plainly contemplates relief both before and after revocation. Compare N.C. Gen. Stat. § 20-24.1(b) with id. § 20-24.1(c).
[29] Bell did not use the phrase "erroneous deprivation," which was coined in Mathews five years later as part of the establishment of a more

42

Nevertheless, the question of whether such revocations are actually erroneous is only the threshold inquiry under the second Mathews factor. Having made this determination, the court must now consider the extent to which the statutory procedures (or lack thereof) increase or mitigate the "risk" of those erroneous deprivations. Mathews, 424 U.S. at 335. It is here that Plaintiffs falter, as they have not persuasively argued that the hearing already provided for by section 20-24.1(b1) fails to substantially alleviate the risk of erroneous deprivations. Plaintiffs only address this crucial opportunity for a hearing once in their briefing on this issue, and their sole reference is to say that "[r]elief from indefinite license revocation is . . . conditioned on the individual knowing about, and affirmatively seeking, a hearing on ability to pay, which is entirely undermined by the insufficient notice the DMV sends the driver." (Doc. 39 at 23.) This is a conflation of issues, as there is a separate standard applicable to the issue of whether the State has provided sufficient notice of the opportunity for a hearing under the Due Process Clause. See Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950) (requiring "notice reasonably calculated, under all the circumstances, to apprise interested parties of the

comprehensive procedural due process test. While Mathews and later cases "represent[] some shift from the approach earlier followed by the Court in Bell," Tomai-Minogue, 770 F.2d at 1235, the Supreme Court has repeated Bell's reasoning on this specific point well into the Mathews era. See Doe, 538 U.S. at 8.

pendency of the action and afford them an opportunity to present their objections").

This same conflation of issues appears to be what undergirds Plaintiffs' general theory that the State must affirmatively hold an ability-to-pay hearing before revocation in every case whether or not the particular traffic defendant wants it. At the hearing, Plaintiffs' counsel argued that the section 20-24.1(b1) hearing was insufficient under due process because traffic defendants "don't know about it" and "don't realize they can" get an ability-to-pay hearing if they ask for one. Again, this argument does not relate to whether section 20-24.1 provides an opportunity for a hearing, but rather whether the State has provided the "notice required by the Due Process Clause . . . to ensure that the opportunity for a hearing is meaningful." City of West Covina v. Perkins, 525 U.S. 234, 240 (1999) (emphasis added). Indeed, holding notice constant, Plaintiffs would be no better off under their own reasoning if North Carolina mandated ability-to-pay hearings in every case prior to revocation, since traffic defendants would still not "know about it."

To be sure, the notice requirement of due process is "obviously a vital corollary to . . . the right to be heard." Schroeder v. City of New York, 371 U.S. 208, 212 (1962). The court will fully address Plaintiffs' notice arguments on their merits below, in the context of Plaintiffs' separately-pleaded notice

claim.[30]  But as to the issue whether the section 20-24.1(b1) hearing itself is sufficient to address the risk of erroneous deprivations, Plaintiffs' arguments as to this <u>Mathews</u> factor provide little basis for their theory that North Carolina must actually hold an ability-to-pay hearing in every case.  In cases in which the Due Process Clause has been found to require pre-revocation process before a person is deprived of a property interest, it has generally been found to require only that an "<u>opportunity</u> for [a] hearing" be provided, <u>Mullane</u>, 339 U.S. at 313, not that a hearing be actually held in every case.[31]  In fact, although Plaintiffs cite a three-judge panel decision of this district as allegedly "affirming [a] statute requiring [a] hearing before suspension" (Doc. 39 at 23), that case actually states that the Due Process Clause requires only that the State hold a hearing for licensees who ask for one: "[I]f the state provides <u>upon request</u> [a hearing] at which the licensee has a fair opportunity

---

[30] Even if the court were to consider the adequacy of the notice provided to traffic defendants as part of the "opportunity to be heard" inquiry, it would find that notice sufficient for the same reasons explained in part II.C.1.b. of this opinion.

[31] To the extent that <u>Bell</u> could be read otherwise, the Fourth Circuit has stated that "[t]he <u>Mathews</u> test, as adopted in <u>Dixon</u> for driver's license deprivation claims, represents some shift from the approach earlier followed by the Court in <u>Bell</u>, which mandated a pre-deprivation hearing."  <u>Tomai-Minogue</u>, 770 F.2d at 1235.  Moreover, the <u>Bell</u> Court had no cause to distinguish between holding pre-deprivation hearings in every case and providing a pre-deprivation opportunity for a hearing, since the State in <u>Bell</u> was already holding pre-deprivation hearings in every case.  The problem in <u>Bell</u> was that drivers were disallowed from addressing a statutorily material issue at that pre-deprivation hearing.

to [make his case], then due process will surely have been satisfied." Jones v. Penny, 387 F. Supp. 383, 395 (M.D.N.C. 1974); see also Mackey, 443 U.S. at 18 (equating giving drivers "[a] presuspension hearing" with giving drivers the ability to "demand a presuspension hearing"). And Plaintiffs make no argument that the actual manner in which a section 20-24.1(b1) hearing is conducted is deficient in some way — indeed they cannot, since no named Plaintiff has invoked his or her section 20-24.1(b1) right to a hearing.[32]

In sum, the court finds that section 20-24.1(b1)'s mandate that traffic defendants be provided a hearing "within a reasonable time" of moving for one substantially alleviates, and may very well eliminate, the risk of erroneous deprivations under the statute.[33] As a result, the second Mathews factor does not command

---

[32] While Plaintiffs' counsel represented at the motions hearing that Bonhomme-Dicks told the state court at her initial traffic appearance that she was unable to pay, this exchange appears to have taken place prior to any fine or costs being imposed in the first place. As a result, the state court appears to have interpreted it as a challenge to the imposition of a fine or costs as punishment for the traffic offense, concluding that it would not impose a fine but would impose costs. As Plaintiffs stress elsewhere, they do not challenge the original imposition of fines or costs for traffic violations; they challenge only the license revocations for a subsequent failure to pay those fines or costs. It does not appear that Bonhomme-Dicks exercised her statutory right to move after the imposition of costs for a section 20-24.1(b1) hearing to show that her subsequent "failure to pay . . . was not willful" and that she was "making a good faith effort to pay," N.C. Gen. Stat. 20-24.1(b)(4).

[33] To the extent Plaintiffs contend that the "reasonable time" allowed for in the statute would not always guarantee the movant a hearing prior to the deprivation, they have given the court no reason to think that it does not. Traffic defendants are given 40 extra days to pay their

46

that additional process be required under the Due Process Clause.

As to the third and final Mathews factor — the governmental interest at stake — the Supreme Court has specifically recognized in the driver's license revocation context that "the substantial public interest in administrative efficiency would be impeded by the availability of a pretermination hearing in every case." Dixon, 431 U.S. at 114; see also Mackey, 443 U.S. at 18 (increasing the number of pre-revocation hearings would "impose a substantial fiscal and administrative burden on the Commonwealth"). This sort of governmental interest "is not a controlling weight" in the Mathews analysis; however, "the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative

_____

fines and costs before the court notifies the DMV of their failure to pay, see N.C. Gen. Stat. § 20-24.2(a)(2), and another 60 days after the DMV sends the revocation order before revocation becomes effective, see id. § 20-24.1(a). No named Plaintiff moved for a section 20-24.1(b1) hearing at any point during this 100-day window, nor does the court have any information on how any North Carolina court has ever treated such a motion. A preliminary injunction is an "extraordinary remedy," and it is up to Plaintiffs to affirmatively "establish that [they are] likely to succeed on the merits." Winter, 555 U.S. at 20, 22. Any contention that North Carolina courts would fail in a meaningful number of cases to provide a statutory pre-revocation hearing within that 100-day window if one were timely requested is purely speculative on this record. Moreover, even if some traffic defendants experience brief license revocation before their hearing takes place, the Fourth Circuit has found that where the "possible causes for erroneous deprivation" of a driver's license in a small number of cases "are all remediable in [a] post-deprivation [opportunity to be heard]," the Due Process Clause does not require additional process to ensure that no "temporary inconvenience" is caused by the temporary revocation. Tomai-Minogue, 770 F.2d at 1235; see also id. at 1235-36 ("Where an adverse judgment has not been satisfied by a motorist, Virginia has opted to suspend the license now and discuss the matter later. We decline to undercut that legitimate choice by requiring the taking to be later and the talking to be first.").

resources is a factor that must be weighed." <u>Mathews</u>, 424 U.S. at 348.

Together, the substantial public interest at issue and the fact that section 20-24.1(b1) already mitigates the risk of erroneous deprivations by providing an ability-to-pay hearing "within a reasonable time" to anyone who requests it weigh against a finding that North Carolina must provide additional process. And as previously noted, "the [Supreme] Court has expressly held that the [private] interest [in a driver's license] is not so great as to require departure from the principle that an evidentiary hearing is not ordinarily required prior to adverse administrative action." <u>Tomai-Minogue</u>, 770 F.2d at 1235 (citing <u>Dixon</u>, 431 U.S. at 113);[34] <u>see also</u> <u>Mackey</u>, 443 U.S. at 12 (burden on private interest in driver's license lessened when "postsuspension review available to a suspended driver" is "timel[y]"). As a result, Plaintiffs have not shown that they are likely to succeed on their "opportunity to be heard" procedural due process claim, and the court therefore declines to grant a preliminary injunction on that basis. <u>Winter</u>, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the

---

[34] While <u>Dixon</u>'s reasoning on what constitutes an "erroneous deprivation" and "the important public interest in safety on the roads and highways" is not applicable here, the opposite is true of its discussion of "[t]he private interest . . . [in] the granted license to operate a motor vehicle" and "the substantial public interest in administrative efficiency." 431 U.S. at 113-14.

merits . . . .").

### b.   Notice

Plaintiffs' final claim, and their final proffered basis for demonstrating a likelihood of success on the merits, is that "[t]he DMV fails to provide adequate notice to drivers either before or after licenses are revoked for failure to pay fines and costs, in violation of the Due Process Clause." (Doc. 35 ¶ 149.) The focus of Plaintiffs' grievance is the one-page revocation order, entitled "Official Notice," that the DMV sends traffic defendants pursuant to section 20-24.1(a) upon receiving notice from a state court that the traffic defendant has failed to pay a fine or cost. See (Doc. 55 ¶ 4).

The first full paragraph of the Official Notice states:

WE REGRET TO INFORM YOU THAT EFFECTIVE [time and date], YOUR NC DRIVING PRIVILEGE IS SCHEDULED FOR AN INDEFINITE SUSPENSION IN ACCORDANCE WITH GENERAL STATUTE 20-24.1 FOR FAILURE TO PAY FINE AS FOLLOWS:

(Doc. 35 ¶ 32.) The Official Notice then lists the traffic defendant's violation date and citation number, as well as the name and phone number of the state court handling the traffic violation. (Id.) The Official Notice continues:

UNFORTUNATELY THE DIVISION OF MOTOR VECHICLES CANNOT ACCEPT PAYMENTS FOR FINES AND COSTS IMPOSED BY THE COURTS. PLEASE CONTACT THE COURT ABOVE TO COMPLY WITH THIS CITATION.

NOTE: PLEASE COMPLY WITH THIS CITATION PRIOR TO THE EFFECTIVE DATE IN ORDER TO AVOID THIS SUSPENSION.

IF YOU HAVE NOT COMPLIED WITH THIS CITATION BY THE EFFECTIVE DATE OF THIS ORDER, YOU WILL NEED TO MAIL YOUR CURRENT NORTH CAROLINA DRIVER LICENSE, IF APPLICABLE, TO THE DIVISION. FAILURE TO DO SO MAY RESULT IN AN ADDITIONAL $50.00 SERVICE FEE.

REINSTATEMENT PROCEDURES:

UPON COMPLIANCE WITH THIS CITATION, YOU MAY VISIT YOUR LOCAL DRIVER LICENSE OFFICE. AT SUCH TIME PROPER IDENTIFICATION AND PROOF OF AGE WILL BE NEEDED.

A RESTORATION FEE OF $65.00 AND THE APPROPRIATE LICENSE FEES ARE NEEDED AND HAVE TO BE PAID AT THE TIME YOUR DRIVING PRIVILEGE IS REINSTATED.

THIS ORDER IS IN ADDITION TO AND DOES NOT SUPERSEDE ANY PRIOR ORDER ISSUED BY THE DMV. IF ADDITIONAL INFORMATION CONCERNING THIS ORDER IS NEEDED, PLEASE CONTACT A REPRESENTATIVE OF THE DIVISION AT (919) 715-7000.

DIRECTOR OF PROCESSING SERVICES

(Id.) As Plaintiffs point out, nowhere does the Official Notice mention that traffic defendants can prevent or reverse their license revocation by demonstrating their inability to pay under section 20-24.1(b)(4), nor does it mention the option of requesting an ability-to-pay hearing under section 20-24.1(b1). Instead, it merely directs recipients to "comply with this citation." (Id.)

In Plaintiffs' view, the Official Notice's failure to notify traffic defendants of the statute's ability-to-pay and hearing provisions makes it "critically misleading" and insufficient under the Due Process Clause. (Doc. 39 at 27.) The Commissioner responds that the "North Carolina[] statute provides" notice and that "procedural due process does not require" individualized

notice.  (Doc. 45 at 21.)

As discussed previously, the notice requirement of the Due Process Clause "ensure[s] that the opportunity for a hearing is meaningful."  West Covina, 525 U.S. at 240; see also Mullane, 339 U.S. at 314 ("Th[e] right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.").  To be sufficient, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Mullane, 339 U.S. at 314.  A "mere gesture" is insufficient.  Id. at 315.  While this requirement sometimes mandates individualized notice, the Supreme Court has held that it does not require "individualized notice of state-law remedies which . . . are established by published, generally available state statutes."  West Covina, 525 U.S. at 241; see also id. ("Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him.").

In this case, there is a publicly available state statute that clearly lays out the procedures available to traffic defendants facing license revocation.  Compare N.C. Gen. Stat. § 20-24.1 with Stinnie, 355 F. Supp. 3d at 529 (explaining that West Covina does not control as to the notice issue in a challenge

to a Virginia license revocation statute because the Virginia statute does not provide for any opportunity to be heard). Plaintiffs make no argument — nor would such an argument be persuasive — that section 20-24.1 is insufficiently clear about these procedures. Instead, Plaintiffs argue that the individualized Official Notice undermines the statutory notice by failing to mention all the relevant statutory provisions. This argument is unpersuasive, as West Covina relies on a presumption that property owners "can turn to . . . public sources" for notice when those sources adequately describe the relevant procedures. Even if the court were to recognize an exception to the West Covina presumption where a state misleads people who otherwise would have turned to a publicly-available statute, such an exception could hardly apply here in light of the fact that the Official Notice directly cites to section 20-24.1 in its first sentence. (Doc. 35 ¶ 32); cf. Nnebe v. Daus, 184 F. Supp. 3d 54, 74 (S.D.N.Y. 2016) (finding that notice was sufficient under the Due Process Clause where — inter alia — the individualized notice documents, despite "not contain[ing]" some important information about the opportunity to be heard "on their face," directly cited to a publicly available document containing the information).[35]  While,

---

[35] Plaintiffs' counsel suggested at the hearing that the cases cited in their briefing "implicitly" say that "if the [individualized] notice goes out and tells someone something, they should be able to rely on what [it says]."  However, most of the "misleading notice" cases Plaintiffs cite predate West Covina, and the few that do not fail to

absent the statute, the Official Notice would not on its own provide sufficient notice, it is not so affirmatively misleading as to destroy the sufficient notice provided by the statute to which it directly cites: "GENERAL STATUTE 20-24.1." (Doc. 35 ¶ 32.)

### 2.   Outcome of Motion for Preliminary Injunction

In conclusion, Plaintiffs have not shown that they are likely to succeed on either of their remaining claims under the Due Process Clause.  Because Plaintiffs' failure to satisfy any one of the four preliminary injunction factors is fatal to their motion, the court need not address the remaining factors and the motion will be denied.  See Pashby, 709 F.3d at 320 (stating that "each preliminary injunction factor [must] be satisfied" (internal quotation marks omitted)).

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the Commissioner's motion for judgment on the pleadings (Doc. 46) is GRANTED IN PART and DENIED IN PART in that Plaintiffs' first claim is DISMISSED WITH PREJUDICE but their second and third claims survive insofar as they have not been challenged at this stage.

IT IS FURTHER ORDERED that Plaintiffs' second motion for class

---

address that decision.  Further, one of Plaintiffs' cited cases is Nnebe itself.

certification (Doc. 36) is GRANTED IN PART and that the following

two classes are certified:

> Revoked Class: All individuals whose driver's licenses
> were revoked by the DMV on or after May 30, 2015, due to
> their failure to pay fines, penalties, or court costs
> assessed by a court for a traffic offense, and whose
> driver's licenses remain so revoked.

> Future Revocation Class: All individuals whose driver's
> licenses will be revoked in the future by the DMV due to
> their failure to pay fines, penalties, or court costs
> assessed by a court for a traffic offense.

IT IS FURTHER ORDERED that Plaintiffs' second motion for

preliminary injunction (Doc. 38) is DENIED.

/s/   Thomas D. Schroeder
United States District Judge

March 31, 2019